2013 COA 147

**BP AMERICA PRODUCTION COMPANY, Plaintiff–Appellee,**

v.

**COLORADO DEPARTMENT OF REVENUE; and Barbara Brohl, in her official capacity as Executive Director of the Colorado Department of Revenue, Defendants–Appellants.**

Court of Appeals No. 12CA1897

Colorado Court of Appeals, Div. II.

Announced November 7, 2013

The Poe Law Office LLC, Alan Poe, Rachel Poe, Englewood, Colorado, for Plaintiff–Appellee

John W. Suthers, Attorney General, Robert H. Dodd, Jr., Senior Assistant Attorney General, Noah C. Patterson, Assistant Attorney General, Denver, Colorado, for Defendants–Appellants

Opinion by JUDGE STERNBERG *

¶ 1 The Colorado Department of Revenue (Department) appeals the judgment entered in favor of BP America Production Company (BP) on BP's motion for summary judgment. The trial court found that return on investment (ROI) is a deductible cost for severance tax purposes under section 39–29–102(3)(a), C.R.S.2013, and allowed BP to deduct such expenses from its tax returns. The Department disagrees and contends that the court should have entered judgment on its cross-motion for summary judgment. We agree with the Department and, therefore, reverse and remand for entry of judgment in its favor.

I. Background

¶ 2 In Colorado, those who extract nonrenewable natural resources from the soil of the state are required to pay a severance tax on the gross income derived from the sale of the resources. This severance tax applies to the extraction of natural gas. The amount of tax paid is based on the total gross income derived from the sale of the natural resource. Colorado's severance tax statute, at section 39–29–102(3)(a), defines gross income as the net amount realized by the taxpayer for the sale of natural gas, calculated on the basis of gross lease revenues minus deductions for "any transportation, manufacturing, and processing costs borne by the taxpayer."

¶ 3 This appeal arises out of BP's amendment of its 2003 and 2004 severance tax returns in which it sought to deduct ROI costs associated with facilities used for trans-

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3) and

§ 24–51–1105, C.R.S.2013.

porting, manufacturing, and processing natural gas.

¶ 4 BP and its predecessors, Atlantic Richfield Company (ARCO) and Amoco Production Company (Amoco), engaged in the transportation, manufacturing, processing, and sale of natural gas. In the 1980s, ARCO and Amoco developed a method for producing natural gas from coal seams in Colorado. The method was unproven, and companies that would normally provide transportation and processing services to natural gas wells were unwilling to invest in the method. As a result, in the mid–1980s ARCO and Amoco invested in and constructed facilities to transport and process the natural gas produced from the coal seam wells. Following construction of the facilities, Amoco, ARCO, and their successor in interest, BP, have been successfully producing and selling natural gas from coal seams.

¶ 5 In late 2005, BP sought to amend its 2003 and 2004 severance tax returns to include deductions for the cost of operating the transportation and processing facilities, for depreciation attributable to its investment in the facilities, and for the ROI associated with the facilities. This amendment was first reviewed by the Mineral Audit Section of the Department, which allowed deductions for BP's operating and depreciation costs for the transportation and processing facilities, but did not allow a deduction for ROI. BP requested a hearing to protest this determination.

¶ 6 The Department's former Deputy Executive Director, Timothy T. Weber, sitting as hearing officer, issued a Final Determination denying BP's deductions for ROI. The hearing officer ruled that ROI is not a transportation or processing cost, but is an "opportunity cost that reflects the cost of alternatives that were forfeited to pursue a certain action."

¶ 7 The hearing officer agreed with the Mineral Audit Section that operating costs and depreciation attributable to the transportation and processing facilities were allowable deductions, but ROI was not. He reasoned that BP would recover the full amount invested in the facilities through depreciation and thus, was not entitled to an additional deduction for ROI. He clarified that ROI was not a cost paid by BP to transport or process natural gas, but instead, an effort to be compensated for the use of invested capital until the invested capital could be recovered by depreciation. Therefore, the hearing officer concluded that ROI did not qualify as a deduction under section 39–29–102(3)(a).

¶ 8 BP then timely appealed the Final Determination to the district court. The parties submitted cross-motions for summary judgment, agreeing that there were no disputed issues of material fact. After oral argument, the court granted summary judgment in favor of BP and ruled that BP was entitled to a refund in the amount of $629,186 for tax year 2003 plus interest, and $669,202 for tax year 2004 plus interest. The court found that section 39–29–102(3)(a) is not ambiguous and that the legislature's use of the word "any" in that statute conclusively established that ROI is an allowable deduction. The court ordered the Department to issue refunds to BP in the amount listed above. The Department appeals the court's judgment.

## II. Discussion

¶ 9 The only issue for our review is whether the court incorrectly interpreted the language "any transportation, manufacturing, and processing costs" in section 39–29–102(3)(a). The Department contends that the court erred in holding that ROI is a deductible transportation or processing cost under the statute. We agree.

### A. Legal Standards

¶ 10 We review a trial court's grant of summary judgment de novo. *Amos v. Aspen Alps 123, LLC*, 280 P.3d 1256, 1259 (Colo. 2012). A trial court's conclusions of law, including its interpretations of statutes, are also reviewed de novo. *Colorado Water Conservation Bd. v. Upper Gunnison River Water Conservancy Dist.*, 109 P.3d 585, 593 (Colo. 2005). While we afford deference to the interpretation of the agency charged with administration of the statute, we, of course, are not bound by the agency's interpretation.

*El Paso Cnty.* *Bd. of Equalization v. Craddock*, 850 P.2d 702, 704 (Colo.1993).

¶ 11 When interpreting statutes, our primary duty is to give full effect to the intent of the General Assembly. *Colorado Water Conservation Bd.*, 109 P.3d at 593. If statutory language is clear, we apply the plain and ordinary meaning of the provision. *Anderson v. Longmont Toyota, Inc.*, 102 P.3d 323, 326 (Colo.2004). However, if the language is ambiguous, that is, "reasonably susceptible to different interpretations," *Bd. of Educ. v. Booth*, 984 P.2d 639, 652 (Colo.1999), we must look beyond the terms of the provision. We examine "the legislative goals underlying the provision, the circumstances under which [the statute] was adopted, and the consequences of possible alternative constructions." *Lobato v. Indus. Claim Appeals Office*, 105 P.3d 220, 223–24 (Colo.2005); see § 2–4–203(1), C.R.S.2013. A statutory interpretation leading to an illogical result will not be followed. *Frazier v. People*, 90 P.3d 807, 811 (Colo.2004).

### B. Statutory Interpretation

¶ 12 BP argues that ROI is an allowable transportation and processing cost based on the plain meaning of the words included in the statute and the legislature's intent in choosing such words. We disagree.

### 1. Plain Meaning

¶ 13 Section 39–29–105(1)(a), C.R.S.2013, imposes a tax on "the gross income of crude oil, natural gas, carbon dioxide, and oil and gas severed from the earth" in Colorado. A taxpayer's gross income is "the net amount realized by the taxpayer for sale of the oil or gas." § 39–29–102(3)(a). The net amount is calculated based upon "the gross lease revenues, less deductions for any transportation, manufacturing, and processing costs borne by the taxpayer." *Id.*

¶ 14 BP, on the one hand, contends that the trial court correctly held that the use of the word "any" in the statute conclusively establishes that ROI is an allowable cost, as the cost of investing capital in a transportation and processing facility qualifies as *"any transportation or processing cost."* The Department, on the other hand, argues that the

term "any" does not expand the meaning of "costs," the word that it modifies. Instead, to qualify as a deduction under the statute, ROI must first be a "cost." Moreover, the Department contends that "costs" is an ambiguous term, and that ROI is not a deductible cost as intended by the statute.

¶ 15 We agree with the Department. In our view, the term "costs" is reasonably susceptible of different interpretations as demonstrated by the fact that "several permutations of the word 'cost' have been deemed ambiguous by Colorado courts." *Atlantic Richfield Co. v. Farm Credit Bank*, 226 F.3d 1138, 1153 (10th Cir.2000). Varying understandings of the term have been found in both statutory and contractual contexts. *See Douglas Cnty. Bd. of Equalization v. Fidelity Castle Pines, Ltd.*, 890 P.2d 119, 125 (Colo. 1995) (the parties agreed that the statutory language "cost of development," was ambiguous as it could reasonably refer to direct or indirect costs, or both); *Pepcol Mfg. Co. v. Denver Union Corp.*, 687 P.2d 1310, 1314 (Colo.1984) (the term "at seller's cost" was facially ambiguous as it could be interpreted as actual use or actual expenditure); *Southgate Water Dist. v. City & Cnty. of Denver*, 862 P.2d 949, 955 (Colo.App.1992) (the phrase "actual costs" was ambiguous because it was not defined in the contract); *Tripp v. Cotter Corp.*, 701 P.2d 124, 126 (Colo.App.1985) (the phrase "cost of milling" was ambiguous as there were no other provisions defining the phrase).

¶ 16 This case law shows us that the term "costs" is not unambiguous on its face. Because we cannot discern the plain meaning of the term based on its use in the statute, we conclude that "costs" is an ambiguous term. Thus, we must look beyond its plain meaning to the term's intended use by the legislature and its context within the statute as a whole.

### 2. Legislative Intent

¶ 17 When a statute is ambiguous, we may consider as indicia of legislative intent the object sought to be obtained by the statute, the legislative history, and the consequences of a particular construction of the statute. *City of Westminster v. Dogan Constr. Co.*,

930 P.2d 585, 590 (Colo.1997); *see* § 2–4–203(1).

¶ 18 The legislature has not explicitly defined what types of "costs" fall within "transportation, manufacturing, and processing costs" under the statute. *See* § 39–29–102(3)(a). Nor does the legislative declaration included in the statute incorporate any guidance on the meaning of "costs." *See* § 39–29–101(1), C.R.S.2013 (explaining only that the primary purpose of the statute is to "recapture a portion of [the wealth lost through the extraction of nonrenewable natural resources] through a special excise tax").

 ¶ 19 As the legislature has not expressly included ROI as a deduction, we must determine whether it is nevertheless a deduction because it is included within the phrase "any ... costs" in the statute. We conclude it is not.

 ¶ 20 Generally, all doubts regarding interpretation of language in a tax statute will be construed in favor of the taxpayer. *Transponder Corp. v. Property Tax Adm'r*, 681 P.2d 499, 504 (Colo.1984). However, when the taxpayer seeks a deduction from taxation, the burden is upon the taxpayer to show the right to such deduction. *INDOPCO, Inc. v. Comm'r of Internal Revenue*, 503 U.S. 79, 84, 112 S.Ct. 1039, 117 L.Ed.2d 226 (1992) (deductions are "a matter of legislative grace and ... the burden of clearly showing the right to the claimed deduction is on the taxpayer" (quoting *Interstate Transit Lines v. Comm'r of Internal Revenue*, 319 U.S. 590, 593, 63 S.Ct. 1279, 87 L.Ed. 1607 (1943))). Such deduction must be explicitly provided for in the statute, and will be strictly construed if so provided. *Id.* We will not construe deductions "beyond the clear import of the language used, nor will their operation be extended by analogy." *Transponder Corp.*, 681 P.2d at 504 (quoting *Associated Dry Goods v. City of Arvada*, 197 Colo. 491, 593 P.2d 1375, 1378 (Colo.1979)).

¶ 21 BP is the taxpayer. Section 39–29–102(3)(a) does not explicitly provide for a deduction for ROI; it allows for deductions only for "transportation, manufacturing, and processing costs borne by the taxpayer." The Department argues that other states'

legislatures that have allowed deductions for ROI have done so only after explicitly defining ROI in their statutes or regulations, and in addition, have made clear that only costs *directly* related to transportation and processing will be allowed as deductions. *See, e.g.*, N.M.Code R. § 3.18.5.8(E)(4)(5), (F); N.M.Code R. § 3.18.6.9(H)(5); N.M.Code R. § 3.18.6.10(H)(5) (including language such as "[a]llowable transportation costs are ... a reasonable rate of return on depreciable capital assets used in the processing operation"); Wyo. Stat. Ann. § 39–14–203(b)(vi)(E) (2013) ("fair market value is [sale proceeds minus] ... total direct processing and transportation costs ... [with exemptions for] return on investment incurred by the taxpayer"). While other states' interpretations of severance tax statutes are not binding on us, we deem it significant that the states that allow a deduction for ROI specifically provide for such deduction in their statutes.

¶ 22 We note also that the Council of Petroleum Accountants Societies, Inc., a national association of oil and gas accountants, makes clear that severance taxes in Colorado should include deductions only for direct costs paid by a taxpayer. *See COPAS Severance Tax Guide, available at* www.copas.org (explaining that deductions are allowed for "any transportation, manufacturing, or processing cost *incurred by* the taxpayer") (emphasis added). These explicit statements allowing for deductions demonstrate that when a legislative body wants to allow a deduction it does so expressly. In the absence of such a clear statement in section 39–29–102(3)(a), we conclude that the Colorado statute does not allow a deduction for ROI.

¶ 23 Despite the fact that ROI is not explicitly included as a deduction, BP nonetheless asserts that we should rely on a literal interpretation of the words "any ... costs" to allow ROI as a deduction under the statute. "Cost" is defined as "[e]xpense; price. The sum or equivalent expended, paid[,] or charged for something." *Black's Law Dictionary* 312 (5th ed.1987). "ROI" is defined as "the opportunity cost of capital." *Atlantic Richfield Co.*, 226 F.3d at 1147. An opportunity cost is not a cost that has been expended or paid; it is a calculation of loss suffered by

a party that has invested in one opportunity instead of a more profitable alternative opportunity. *Massachusetts v. Interstate Commerce Comm'n*, 893 F.2d 1368, 1370 (D.C.Cir. 1990).

¶ 24 Legislative history and consideration of the statute's purpose also demonstrate that opportunity cost does not fall within the intended meaning of the statute. An opportunity cost is a hypothetical cost that is based on an alternative investment. It is not a cost that has already been expended to transport or process oil or gas from its point of extraction at the wellhead, as intended by the legislature. *See Hearings on H.B. 1196 Before the S. Fin.* Comm., 55th Gen. Assemb., 1st Reg. Sess. (Mar. 19, 1985) (the definition of "gross income" was added with the goal of "trying to get to [the] raw value [of gas] at the wellhead prior to manufacturing, processing and transportation ... [to get] a representative field price based on the product at the wellhead" (emphasis added)). Thus, ROI is not a "cost" as intended by the legislature. Therefore, it cannot be "any ... cost," and we decline to adopt BP's interpretation. Because ROI is not a "cost" as intended by the legislature, the need for a factual determination of what types of costs constitute "return on investment" is obviated.

¶ 25 As further aid to our interpretation, we may also look to the order of words in a statute to deduce the legislature's intended meaning. *City & Cnty. of Denver v. Taylor*, 88 Colo. 89, 91, 292 P. 594, 595 (1930) ("where the legislative intent is doubtful, resort to rules of construction is proper"). If specific designations precede more general language, the application of the general language is controlled by the specific. *Id.* This rule of interpretation prevents "a stretch of meaning beyond the legislative [intent]." *Id.* at 92–93, 292 P. at 595.

¶ 26 Here, the terms "transportation, manufacturing, and processing" are specific designations that precede a general term, "costs." § 39–29–102(3)(a). We conclude that the legislature intended the specific terms to control the general term. It is our interpretation, then, that only costs incurred directly for the transportation or processing of oil or gas are allowable deductions under the statute. Thus, costs incurred directly for operating a facility that is used for the transportation and processing of oil or gas are permissible transportation and processing costs under the statute. Indirect costs are not within the intended deductions of the statute. ROI, as described above, is an indirect, speculative cost and cannot be deducted under the statute.

¶ 27 Finally, we must utilize our understanding of the legislature's intent and the construction of its words to interpret the statute in a way that does not produce an illogical result. *Frazier*, 90 P.3d at 811. Our resulting interpretation must be consistent with the purpose of the legislation, such that the intention of the legislature prevails over an interpretation that leads to an unsound result. *See, e.g., AviComm, Inc. v. Colo. Pub. Utils. Comm'n*, 955 P.2d 1023, 1031 (Colo.1998).

¶ 28 To allow BP a deduction based on ROI would allow BP to recover its costs of investment twice. This would lead to an illogical result under the statute. These claimed ROI expenses have already been accounted for by the Department in its Final Determination that allowed recovery of investment costs through depreciation: "operating costs and depreciation attributable to the transportation and processing facilities owned by BP were allowed as deductions," explaining that "BP as developer and owner of the facilities will recover over the life of the project the full amount invested, through depreciation."

¶ 29 We agree that operating costs are allowable deductions within the meaning of the statute because such expenses have been directly incurred to pay for the operation of the facilities owned by BP. However, to allow BP to recover some hypothetical cost associated with ROI when it has already been allowed to recover depreciation costs would constitute a double recovery. Because we are not persuaded that ROI is a cost *paid for* the transportation or processing of oil or gas, we hold that ROI is not a deductible cost. Thus, our determination of the proper method of calculation of ROI as a deductible cost for severance tax purposes is not necessary.

¶ 30 In the absence of an explicit statement by the legislature, and for the reasons stated above, we conclude BP has not met its burden to establish that a deduction for ROI should be read into the statute. Therefore, the trial court erred when it allowed ROI as a deductible transportation or processing cost under section 39–29–102(3)(a).

¶ 31 The judgment in favor of BP, including the award of the stipulated refund, is reversed. Because the parties have agreed that there are no disputed issues of material fact, the case is remanded to the trial court with instructions to enter judgment in favor of the Department on its cross-motion for summary judgment.

CHIEF JUDGE LOEB and JUDGE VOGT * concur.